IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JAMES A. MORRIS,

      Plaintiff,

v.                                CASE NO. 2:07-cv-0783

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the
Commissioner of Social Security denying the Plaintiff's application
for disability insurance benefits ("DIB") and supplemental security
income ("SSI"), under Titles II and XVI of the Social Security Act,
42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was
referred to this United States Magistrate Judge to consider the
pleadings and evidence, and to submit proposed findings of fact and
recommendation for disposition, all pursuant to 28 U.S.C. §
636(b)(1)(B).

Plaintiff, James A. Morris (hereinafter referred to as
"Claimant"), filed applications for SSI and DIB on February 2,
2006, and February 8, 2006, alleging disability as of September 22,
2001, due to heart blockages, a low heart rate, shortness of breath
with exertion, depression, adult attention deficit disorder, left
arm pain, and back pain.  (Tr. at 15, 39, 44, 92-97, 132-38.)  The

claims were denied initially and upon reconsideration. (Tr. at 15, 34-38, 39-43, 44-48, 49-53, 61-63, 64-66.) On October 12, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 67.) The hearing was held on February 14, 2007 before the Honorable James P. Toschi. (Tr. at 72, 338-61.) By decision dated February 24, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-27.) The ALJ's decision became the final decision of the Commissioner on October 9, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 5-7.) On December 4, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§

2

404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists

3

in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant's earning record indicates he has performed substantial gainful activity since his alleged onset date; however, the ALJ chose to proceed with the sequential evaluation process and find that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 17.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairment of complete heart block with status post permanent pacemaker insertion. (Tr. at 18.)  At the third inquiry, the ALJ concluded that Claimant's impairment did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 22.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 22-26.)  As a result, Claimant can return to his past relevant work. (Tr. at 26-27.)  On this basis, benefits were denied. (Tr. at 27.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less

4

> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.   Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational."   Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was thirty-seven years old at the time of the

administrative hearing. (Tr. at 344.) He completed high school.

(Tr. at 340.) He attended three semesters of college but did not

complete any semester hours. (Tr. at 349-50.) In the past, he

worked as a nursing assistant, a cleaner, a pantry goods maker, and

a waiter. (Tr. at 349-52.)

The Medical Record

The court has reviewed all evidence of record, including the

medical evidence of record, and will summarize it briefly below.

Physical Evidence

On October 5, 1984, Claimant, age fourteen, was admitted to Charleston Area Medical Center ("CAMC") with a closed fracture of his left mandible, undisplaced, and displaced and over-riding left supracondylar fracture. Following surgery, Claimant was discharged on October 10, 1984 with instructions to continue a liquid diet and follow-up with Fred Pulido, M.D. in two days. (Tr. at 311.)

A note from Dr. Pulido's office states: "Marked 1st degree heart block. Intraventricular conduction defect. Myocardial changes and/or digitalis effect more marked than on the previous tracing. Taken by phone 10-11-84." (Tr. at 312.)

On December 10, 1984, Claimant had an echocardiogram at CAMC, which was interpreted by Harold Selinger, M.D.:

> Except for the absence of an A wave which can be explained on the first degree AV block, this echocardiogram appears to be normal except for questionable mitral valve prolapse. The 2-D echo once again shows excellent ventricular function with normal mitral valve motion and normal aortic valve motion. On the short axis once again the tricuspid valve is very well seen. The aortic valve opens and closes perfectly normally. The pulmonary valve is well seen. The apical four chamber view also suggest the possibility of minimal mitral valve prolapse. Conclusion: Normal echo except for minimal mitral valve prolapse.

(Tr. at 315.)

Records from CAMC, Department of Cardiac Rehabilitation, dated February 5, 1985, indicate Claimant underwent exercise stress tests. (Tr. at 313-14.)

Records from Ronald J. McCowan, M.D., dated April 18, 1985,

6

July 28, 1986, September 14, 1992, April 17, 1996, October 17, 2001, November 16, 2001, March 31, 2003, January 13, 2004, and January 27, 2004 indicate Claimant saw Dr. McCowan related to his cardiac care.  The records further indicate that claimant failed to keep appointments with Dr. McCowan set for April 17, 1996, July 8, 2002, September 10, 2002, November 11, 2002, April 7, 2003, April 23, 2003, June 2, 2003, January 20, 2004, January 26, 2004, and September 21, 2004.  (Tr. at 316-20.)

On September 24, 2001, Claimant sought treatment at Charleston Area Medical Center's emergency department for mid-sternum pain that radiated to his back.  The attending physician (illegible) wrote to Dr. McCowan:  "In ER, patient found to be in CHB [complete heart block]....EKG showed third degree AV block." (Tr. at 256.)

On August 25, 2003, Claimant was admitted to CAMC emergency department ("ED") for complaints of chest pain.  Brendan L. O'Hara, M.D. was the attending physician.  In the ED report, he found:

> The patient had similar chest pain when hospitalized in September 2001.  At that time no ischemia was appreciated but the patient had an intermittent second degree heart block as sell as severe first degree heart block.  He was seen by Dr. McCowan and elected to be managed medically. He signed out against medical advise (sic).  He currently has done fairly well with only occasional recurrence of chest pain until five days ago...
> Laboratory/X-ray Results:  CBC, basic metabolic profile within normal limits.  EKG showed a sinus bradycardia with a rate of 29 with marked first degree heart block. No second degree heart block was noted.   No acute ischemic changes were noted.  EKG essentially unchanged from two years ago.  Chest x-ray showed no acute cardiopulmonary process.
> ER Treatment and Course: Evaluation... given Ecotrin 325

mg by mouth and started on 2 liters of nasal oxygen.  The
chest pain resolved after the aspirin and did not recur.
I discussed the case by phone with Dr. McCowan who
suggested admitting the patient to the hospital for a
stress test in the morning with anticipated cardiac
pacemaker placement on Wednesday.   This outcome was
anticipated two years ago, according to the patient.  The
patient became impatient, apparently as he did two years
ago and likened to sign out AMA [against medical advice]
to return in the morning for a stress test... Clinical
Impression:  Sinus arrhythmia with severe bradycardia.

(Tr. at 251, 324.)

On August 26, 2003, Claimant underwent an exercise stress test

at CAMC.  John L. Leef, III, M.D. interpreted the results:

There is mild enlargement of both the right and left
ventricles... There is a count misregistration artifact
with blinking and absent counts in one of the frames.
This may be related to an irregular heart rhythm.  The
global wall motion is however normal.   Calculated left
ventricular ejection fraction is 50%. Impression: Normal
myocardial perfusion stress and rest imaging.

(Tr. at 237.)

On January 6, 2004, Claimant was admitted to CAMC emergency

department for complaints of chest pain.  Sam Abdul, M.D. was the

attending physician.  In the ED report, he found:

The patient was hemodynamically stable in the ED.  He had
no light-headedness, presyncope, or distress.    He
remained in first degree AV block.  I discussed this case
with Dr. Lilly, on call for Dr. McCowan.  He recommended
transferring the patient for observation in Memorial
Division.    He recommended the patient stay for
observation overnight.  The patient does not wish to be
transferred to an observation bed...He says he has chores
he has to do.  The patient is siding against medical
advice.

(Tr. at 235.)

On January 12, 2004, Claimant was admitted to CAMC emergency

8

department with complaints of breathing problems.  John A. Turley,

M.D. was the attending physician.  In the ED report, he found:

> Blood pressure was checked at 0840 and found to be
> 127/79.  He was given four baby aspirin p.o.  He was
> placed on two liters of oxygen, but took it off because
> it irritated his nose. He continued to sat [arterial
> oxygen percent saturation] well.  At 0900, pulse 74,
> blood pressure 118/58 and he had frequent PACs on the
> monitor.  At 1115, pulse 68, blood pressure 128/68.  No
> chest pain.  Shortness of breath is largely resolved at
> this time.  Continued to have occasional PACs on the
> monitor.  Patient was discussed with Dr. McCowan, who
> felt that since he was stable, it would be okay to be
> discharged home and follow up in the office.

(Tr. at 230.)

On January 27, 2004, Dr. McCowan, M.D. examined Claimant

regarding his cardiac care. His office note indicates:

> Chief Complaint:  Congenital complete A-V block.
> Subjective:  James is here in the office today stating he
> is concerned because he lost his job at General Division.
> He believes that he was unfairly fired.  He has had no
> further episodes of chest discomfort and denies dizziness
> and syncope.  He continues to play basketball once a
> week.
> Objective:  WT: 215 lb.  HT: 6'3".  BP: 108/74.
> Lungs:  Clear bilaterally without rales, rhonchi, or
> wheezes.
> Cardiac:  Regular rhythm with normal S1 and S2.  No S3 or
> S4 detected.  No murmurs, rubs or thrills.  PMI not
> displaced.
> EKG/RS:  Marked bradycardia with a ventricular rate in
> the 30 bpm range.  There are episodes of A-V nodal
> Wenckebach with 4:3 and 2:1 conduction.
> Assessment/Plan:  1.  (426.0) Heart block complete
> 2.  (794.31) EKG abnormal
> The patient is stable from a cardiovascular standpoint.
> Nothing further needs to be done at this point in time.
> The patient states he is going to St. Francis and Thomas
> Memorial Hospital to try to get another job.

(Tr. at 316.)

9

On January 26, 2006, Claimant visited Arrhythmia Treatment Associates for an assessment related to the implantation of a pacemaker, which was recommended. (Tr. at 208.)

On February 4, 2006, Claimant had an echocardiogram ("EKG") at West Virginia Cardio Diagnostics.   Ganpai G. Thakker, M.D., interpreted the EKG and found:

> 1. At least second-degree heart block with bradycardia appears to be present during this study.
> 2.  Mild left atrial enlargement.
> 3.  Left ventricular ejection fraction is normal at 55-60% without hypertrophy.  Borderline enlargement perhaps reflects increased volume from bradycardia.
> 4.  Diatolic mitral regurgitation due to heart block.
> 5.  Mild pulmonic and trace tricuspid regurgitation.

(Tr. at 328.)

On February 13, 2006, Claimant visited Arrhythmia Treatment Associates for an assessment related to the implantation of a pacemaker, which was recommended.  The report was authenticated by Dr. McCowan.  (Tr. at 207, 210, 322, 330.)

On February 15, 2006, Dr. McCowan inserted Claimant with a dual chamber permanent pacemaker. Dr. McCowan explained the procedure in a one-paragraph report, which concluded: "The patient tolerated the procedure well and there were no apparent complications.  Estimated blood loss 15cc."  (Tr. at 211, 323.)

On February 15, 2006, Claimant had a chest two view x-ray at CAMC prior to insertion of a pacemaker.  Jeffrey C. Dameron, M.D. interpreted the medical imagining and found "no radiographic evidence for acute or active disease within the chest."  (Tr. at

216.)

On February 15, 2006, Claimant had a portable chest x-ray at CAMC following insertion of a pacemaker.  John E. Reifsteck, M.D. interpreted the medical imaging and found "[n]o gross signs of acute infiltratos or signs of failure in this patient with devices in places as described."  (Tr. at 217.)

Office notes from Charleston Family Health Associates dated February 20, 2006, June 2, 2006, and October 6, 2006 are mostly illegible but appear to indicate claimant was seen for "need family doctor had pacemaker one week ago" for the first visit, "flu visit" on the second visit, and "left elbow pain needs referral for patient at Holzer, patient wants to discuss depression" on the last visit.  (Tr. at 297-99.)

Office notes from Holzer Clinic note Claimant had office visits on June 7, 2006, June 13, 2006, and June 14, 2006 for occupational treatment of his left elbow and shoulder, which he reported occurred after placement of the pacemaker on February 15, 2006.  Claimant did not show up for a June 9, 2006 appointment. (Tr. at 276-80.)  At the initial evaluation, Claimant reported being right handed and the frequency of therapy was to be three times a week for four weeks.  (Tr. at 278-79.)  It is noted that during Claimant's testimony he stated that he was left-handed. (Tr. at 347.)

On July 3, 2006, Nilima Bhirud, M.D. completed a Disability

11

Determination Evaluation of Claimant.  Dr. Bhirud made these observations regarding Claimant's physical examination:

> The claimant is 73 inches in height, weight 219 and age 36.  The claimant could pick up a coin from the floor. The claimant could stand on each foot at a time.  The claimant could do heel-walking, toe-walking, and squatting.  The claimant's gait was normal.  The claimant could walk in tandem gait.  The claimant was not using any ambulatory aid.  The claimant was comfortable in sitting and standing positions... Assessment:  The claimant is a 36-year old male who gives history of congenital heart block.  He had a permanent pacemaker on March (sic - February) 15, 2003 (sic - 2006).  According to his cardiologist, he can go back to work except for running a jackhammer.  The claimant says he has developed pain in his left elbow since the pacemaker insertion.  He has gone to physical therapy.  At the time of examination, he had tenderness over the medial and lateral condyle of the left elbow.  He had a good grip.

(Tr. at 281-82.)

On July 14, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work with an ability to frequently climb ramp/stairs, balance, stoop, kneel, crouch, and occasionally climb ladder/rope/scaffolds and crawl.  Claimant had no manipulative, visual, or communicative limitations. Claimant's only environmental limitations were to avoid concentrated exposure to vibration and hazards. (Tr. at 287-91.) The evaluator, A. Rafael Gomez, M.D. opined that "Patient is credible.  He had permanent pacemaker implantation for congenital heart block.  No complications from this procedure.  Patient is reduced to medium work."  (Tr. at 292.)

12

On August 23, 2006, Amy Wirts, M.D., a State agency medical
expert reviewed the evidence of record and affirmed the opinions of
Dr. Gomez.  (Tr. at 295.)

On January 15, 2007, Melissa Gamponia, M.D. provided a form
"Medical Assessment of Ability to Do Work-related Activities." Dr.
Gompania indicates on the form that Claimant can occasionally carry
fifteen pounds and frequently carry five pounds; Claimant's
standing/walking/sitting are not affected; Claimant can never climb
or crawl due to a left shoulder and arm impairment; Claimant can
occasionally balance, stoop, crouch, and kneel; Claimant has no
restrictions related to chemicals, dust or noise but is restricted
on heights, temperature extremes, fumes, humidity and vibrations;
Claimant has manipulation limitations for the left hand only; and
Claimant has no visual or communication limitations.  (Tr. at 333-
35.)  Although the handwriting is largely illegible, Dr. Gamponia
appears to conclude "sedentary work only   (illegible word)
difficult due to adult ADD." (Tr. at 335.)

Psychiatric Evidence

On May 19, 2005, Claimant underwent a Comprehensive
Psychiatric Evaluation at the Worthington Center by David K.
Walker, M.D.  Dr. Walker found that Claimant's chief complaint is

> having problems dealing with people... actually says he
> was encouraged to come by his wife because he keeps
> losing jobs... he says he often talks back on the job and
> has lost many jobs...
> Mental Status Exam:  He is neat, clean, alert and
> cooperative.  He is friendly enough in the interchange,

13

and he talks rather readily.  He denies any depression, has no vegetative signs of mood problems and never thinks of hurting himself.  He does say that he is angry, irritable and anxious a lot.  He has a lot of trouble being around people.  There is no evidence of psychosis. Cognitive testing is intact.
Impression:
Axis I:  Anxiety Disorder, not otherwise specified with social anxiety traits (300.00)
Axis II:  No diagnosis, but a personality disorder with possible schizoid or avoidant traits needs to be considered
Axis III:   Severe bradycardia with plans to insert a pacemaker
Axis IV:  Psychosocial stressors:  Unemployment, being divorced and living with his ex-wife, having no money of his own, having very little support
Axis V:  GAF: 60
This gentleman's problem may mostly be related to his personality style, but he does have anxiety with a fair amount of social anxiety traits.  I think we can try to treat the anxiety, and he is willing to do that.  He also needs to expand his horizons.  He has limited himself too much, and I worry that he does not see how limited he is. He is not willing to go into therapy, but his wife is very outgoing, and he says he will try to use her to help him learn more social responsiveness... A prescription is written for Zoloft 100 mg daily, #30 and no refills.  I will see this gentleman back in four weeks to see how he is doing with the medication.

(Tr. at 205.)

On June 20, 2005, a progress note signed by Dr. Walker states that Claimant is prescribed Celexa and there are "no changes since starting." (Tr. at 306.)

On July 14, 2005, a progress note signed by Dr. Walker states that Claimant is prescribed the psychiatric medications Celexa and Concerta.  He writes on the form that Claimant's mood is "neutral" and affect "broad." (Tr. at 203.)  He diagnoses anxiety, ADHD, and cannabis dependence. (Tr. at 204.)

14

On February 9, 2006, a progress note signed by Dr. Walker states that the chief complaint is that Claimant has not been taking his psychiatric medications, Celexa and Concerta. He writes on the form that Claimant's mood and affect are "depressed". (Tr. at 201.) He diagnoses anxiety, ADHD, and cannabis dependence and prescribed resuming medications. (Tr. at 202.)

On May 25, 2006, Claimant had a mental status examination by Mareda L. Reynolds, M.A., a licensed psychologist. Ms. Reynolds made the following diagnosis:

```
Axis I:   304.30    Cannabis Dependence
          311       Depressive Disorder NOS
                    [not otherwise specified]
Axis II:  V71.09    No Diagnosis
Axis III: By Report: Heart Problems
Summary and rationale for diagnosis:
James Morris...has a high school education and completed
four semesters of college courses. He has a long history
of marijuana use. He has been fired from an estimated
150 jobs.   He also reported ongoing symptoms of
depression including low mood, social withdrawal, and
feelings of hopelessness, helplessness and worthlessness.
Prognosis:  Fair.  Capability:  Mr. Morris should be
appointed a payee to assist him to manage any financial
benefits he may be awarded.
```

(Tr. at 261.)

On June 8, 2006, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant's mental impairments were not severe. The evaluator, Timothy Saar, Ph.D., opined Claimant had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and

15

no episodes of decomposition.  Dr. Saar found the evidence does not establish the presence of the "C" criteria.  (Tr. at 272-73.)  He noted that Claimant had depression NOS [not otherwise specified] and cannabis dependency. (Tr. at 262, 265, 270.)  He further noted:

> rapport easily established and sufficient for purpose. He was cooperative and forthcoming with all info requested... Coaches a children's basketball team 1-2x week...plays golf 1x week with friends...goes and checks on dad, goes to library to read newspaper, goes to dr. appts. if any, stays with family and friends, cannot seem to keep a job...fixes simple meals.  Does laundry. Shops, handles money with problems, reads, plays basketball, watches tv, coaches, plays playstation. Talks on phone.  Goes to church sometimes.  Tries to see children everyday - goes to sporting events they are in. Needs reminders.  Trouble getting along with others because he doesn't like to be told what to do.  Trouble with talking, completing tasks, concentration, following instructions, and getting along with others.  Analysis: Claimant appears credible.  Can manage basic ADLS [activities of daily living scale] and social interactions.  CE notes P/P WNL [within normal limits], and Con as mild.  Evidence does not support severe limitations in F.C. [functional capacity] due to mental impairment.  Decision - Impairment not severe.

(Tr. at 274.)

On August 25, 2006, Holly Cloonan, Ph.D., a State agency medical expert reviewed the evidence of record and affirmed the opinions of Dr. Saar.  (Tr. at 296.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because(1) the ALJ erred in assessing Claimant's credibility regarding his subjective complaints; (2) the ALJ failed to give proper weight to the

16

opinions of Claimant's treating physician; and (3) the ALJ failed to pose a complete hypothetical question to the vocational expert when he did not consider the combined effect of Claimant's impairments. (Pl.'s Br. at 2-13.)

The Commissioner argues that the ALJ's decision is supported by the substantial evidence because (1) the ALJ properly assessed the medical evidence and Claimant's credibility; (2) the ALJ properly considered the opinions of the treating physician; and (3) the vocational expert responded to a hypothetical question that fairly set out all of Claimant's limitations from his impairments, both individual and combined. (Def.'s Br. at 12-19.)

<u>Credibility</u>

Claimant first takes issue with the ALJ's assessment of his credibility regarding his subjective complaints. Claimant asserts that the ALJ failed to consider the factors outlined in the regulations when he made "a conclusory credibility finding" concerning Claimant's impairments without considering that he was in "noncompliance" due to his inability to financially afford treatment. (Pl.'s Br. at 4, 7.)

The Commissioner argues that the ALJ properly assessed the medical evidence and Claimant's credibility. The Commissioner states that the ALJ specifically considered the factors outlined in the regulations and "did not merely make conclusory statements" about Claimant's subjective complaints but "[r]ather devoted three

17

and a half pages of his decision to a discussion of the evidence
supporting his conclusions." (Def.'s Br. at 13.) Regarding
Claimant's argument that his history of noncompliance with his
medical treatment was due to an inability to afford treatment, the
Commissioner argues there is no support for this allegation in any
of Claimant's numerous records. The Commission asserts that at
most, Claimant's records indicated that his insurance would not
cover Zoloft, so he was switched to Celexa and Concerta instead.
(Def.'s Br. at 15.)

Contrary to Claimant's assertions, the ALJ's decision fully
complied with the requirements of Social Security Ruling 96-8p that

> [i]n assessing RFC, the adjudicator must consider
> limitations and restrictions imposed by all of an
> individual's impairments, even those that are not
> "severe." While a "not severe" impairment(s) standing
> alone may not significantly limit an individual's ability
> to do basic work activities, it may--when considered with
> limitations or restrictions due to other impairments--be
> critical to the outcome of a claim. For example, in
> combination with limitations imposed by an individual's
> other impairments, the limitations due to such a "not
> severe" impairment may prevent an individual from
> performing past relevant work or may narrow the range of
> other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 362207, *34477 (1996).

Social Security Ruling 96-7p clarifies when the evaluation of
symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929
requires a finding about the credibility of an individual's
statements about pain or other symptom(s) and its functional
effects; explains the factors to be considered in assessing the

credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.  The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

In his decision, the ALJ considered the evidence of record related to Claimant's impairments and concluded that while his complete heart block with status post permanent pacemaker insertion was a severe impairment, he retained the functional capacity to perform light work.  He reasoned that Claimant's complaints,

including his assertions that he was unable to seek treatment because he cannot financially afford the co-pay, were inconsistent with the objective medical evidence and Claimant's daily activities. (Tr. at 23-25.)   The ALJ found:

> There are several inconsistencies in the record. Although the claimant alleges inability to perform work activity beginning September 22, 2001, due to severe physical and mental limitation, he reported on November 16, 2001, that he had gone back to playing flag football without difficulty (Exhibit 20F).  On January 27, 2004, the claimant reported he continued to play basketball once a week (Exhibit 20F).  On May 19, 2005, the claimant reported coaching basketball to help his children. (Exhibit 1F).  On January 26, 2006, the claimant reported playing basketball one to two times a month (Exhibit 2F). On February 24, 2006, the claimant reported that if he is not working, he visits his father and goes to the library to read the newspaper.  He reported preparing simple meals, washing clothes, shopping, paying bills by using money orders, reading, watching television, playing video games, talking on the telephone, spending time with his children, going to church and going to sporting events that his children are playing in (Exhibit 5E).  On May 25, 2006, the claimant reported doing odd jobs for neighbors and reported he planned to start giving basketball lessons.  He reported spending the day cleaning the house... playing golf with friends once a week (Exhibit 4F).  These activities are inconsistent with the alleged severity of the claimant's symptoms.
>
> Although the claimant alleges severe limitations as a result of his heart condition beginning on September 22, 2001, he reported on August 25, 2003, that he had been doing fairly well since last seen in the emergency room in 2001 with only occasional recurrence of chest pain until five days earlier (Exhibit 3F).  The record indicates no ongoing treatment for his heart condition during the years 2002 or 2005, which is inconsistent with the claimant's allegation of ongoing disabling symptoms. Although the claimant alleges he is unable to get along with people, which has resulted in him getting fired from jobs, he gets along well with his family.  He has friends with whom he plays basketball and golf.  He coaches a children's basketball team.  He goes shopping, talks on

20

the telephone, goes to the library, attends church and sporting events.  The undersigned observed the claimant to interact in a socially appropriate manner throughout the hearing, the claimant interacted appropriately during his psychological evaluation (Exhibit 4F).  Although the claimant alleges disabling psychological symptoms, he has only intermittently sought treatment for his symptoms. Furthermore, the claimant has a history of noncompliance with medical treatment.

Based on the above inconsistencies the unimpressive medical findings and the lack of ongoing treatment for his psychological symptoms, the undersigned finds the claimant is not entirely credible (SSR 96-7p)....

On March 10, 2006, the claimant reported pain in his chest and shoulder, which he described as stabbing and crushing...Medication relieves the pain or makes it better.  The claimant reported taking Motrin every six hours, which always relieves the pain.  He reported having shoulder pain, which he described as burning.  The pain is constant until the medication works.  The claimant described the pain as nagging.  He reported taking Motrin every four hours, which always relieves the pain.  He reported taking Tylenol every four hours, which sometimes relieves the pain (Exhibit 6E).  The claimant currently reports taking the following medications: Concerta, Celexa and Skelaxin (Exhibit 16E).

As noted above, the claimant alleged significant pain and a greatly diminished capacity for physical activity. However, the objective findings do not provide a basis for such pain and limitations.  As to effectiveness of treatment, the claimant's testimony would indicate a complete failure of treatment.  However, the claimant is lacking in credibility.  The documentary record fails to establish the existence of side effects, which would impact on the claimant's ability to perform his past relevant work.  As to daily activities, the claimant has reported performing a broad range of daily activities.

Following an application of these seven areas to the claimant's case, the undersigned determines the claimant suffers from some limitation on his ability to perform work but not to the degree alleged.  Accordingly, the undersigned finds the above residual functional capacity is consistent with the record as a whole.

(Tr. at 24-25.)

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's subjective complaints of pain and limitations, the court proposes that the presiding District Judge find that the ALJ properly weighed Claimant's subjective complaints of pain and properly assessed Claimant's credibility and the combination of his impairments, in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence.   20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996).

<u>Treating Physician</u>

Claimant next takes issue with the ALJ's weighing of the opinion of his treating physician, Melissa Gompania, M.D., who provided a "Medical Assessment of Ability to Do Work-related Activities" form on January 15, 2007, finding Claimant was limited to sedentary work.   (Pl.'s Br. at  8-12.)

The Commissioner argues the substantial evidence supports the ALJ's finding that Dr. Gompania's medical assessment was entitled to little weight because Dr. Gomez's and Dr. Bhirud's reports demonstrate there was nothing in the record to support the majority of Dr. Gamponia's postural restrictions.   (Def.'s Br. at  16-18.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a

treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. <u>See</u> 20 C.F.R. § 404.1527(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W. D. Va. 1996); <u>see also</u>, 20 C.F.R. § 404.1527(d)(2) (2006).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527. These factors include: (1) Length of the treatment relationship and frequency of

23

evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  Id. § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight is given to an examiner than to a non-examiner.  Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  Section 404.1527(d)(2)(i) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given.  Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

Claimant takes issue with the weight afforded the opinion of Dr. Gamponia.  The ALJ's reasons for discounting this evidence are in keeping with the applicable regulations and case law cited

above.  The ALJ found it entitled to less weight because it was inconsistent with the objective medical evidence of record and Claimant's own description of his activities of daily living.

The ALJ analyzed the medical evidence of record and found:

A. Rafael Gomez, a State Agency medical expert, reviewed the evidence of record and completed a Physical Residual Functional Capacity Assessment on July 14, 2006.  Dr. Gomez opined the claimant could lift and carry 50 pounds occasionally and 25 pounds frequently.  He felt the claimant could stand and/or walk about six hours and sit about six hours during an eight-hour workday.  He felt he could occasionally crawl and climb ladders, ropes and scaffolds...(Exhibit 8F). Amy Wirts, M.D., a State Agency medical expert, reviewed the evidence of record of August 23, 2006, and affirmed the opinions of Dr. Gomez (Exhibit 9F).  The opinions of Drs. Gomez and Wirts are entitled to significant weight as they are supported by the entire evidence of record.  However, giving the claimant the full benefit of doubt, the undersigned finds he has greater limitations as stated above in Finding No. 5.

Melissa Gamponia, M.D., the claimant's treating physician, completed a Medical Assessment of Ability to do Work-related Activities form on January 15, 2007.  Dr. Gamponia opined the claimant could lift and carry 15 pounds occasionally and 5 pounds frequently.  She felt he has no limitation in his ability to stand, walk or sit. She felt the claimant could never climb or crawl.  She felt he could occasionally balance, stoop, kneel and crouch...She felt the claimant could only occasionally use his left hand for handling, fingering or feeling. Dr. Gamponia further opined the claimant can use his left hand for reaching on a less-than-occasional basis (Exhibit 24F).  Dr. Gamponia's opinions are entitled to little weight as they are not supported by the objective evidence of record.  Furthermore, these limitations are inconsistent with the claimant's own description of his activities of daily living.

(Tr. at 26.)

The court notes the January 15, 2007 form is the only medical opinion from Dr. Gamponia in the record.  Claimant seems to suggest

25

that it was necessary for the ALJ to recontact Dr. Gamponia for clarification of her opinion and for additional evidence regarding Claimant's limitations. (Pl.'s Br. at 10-11.) However, it was unnecessary for the ALJ to do so as there was sufficient evidence in the medical record for the ALJ to make a decision regarding Claimant's impairments and Dr. Gamponia's report was not ambiguous. Further, it is the Claimant's burden to prove disability including furnishing medical and other evidence that can be used to reach conclusions about Claimant's medical impairments. 20 C.F.R. § § 404.1512(a), 416.912(a).

Based on the above, the court proposes that the presiding District Judge find that the ALJ's weighing of this evidence is in keeping with the applicable regulations at 20 C.F.R. §§ 404.1527(d)(2006) and is supported by substantial evidence.

Hypothetical Question

Claimant next takes issue with the ALJ's hypothetical question posed to the vocational expert. Claimant argues that the ALJ erred in failing to consider the combined effect of Claimant's impairments. (Pl.'s Br. at 12-13.)

The Commissioner argues that Claimant's assertion regarding the hypothetical question has no merit because the vocational expert responded to a hypothetical question that fairly set out all of Claimant's limitations from his impairments, both individual and combined. (Tr. at 18-19.) The Commissioner asserts that the ALJ

posed a hypothetical question that included limitations well beyond those Claimant possesses and that the ALJ gave Claimant "the benefit of the doubt in reducing his residual functional capacity from medium, as found by Dr. Gomez, to light work." (Def.'s Br. at 16.)

At the February 14, 2007 hearing, the ALJ posed this hypothetical question:

> Based on the claimant's age, education and work experience, assume the residual functional capacity for light work with the following additional limitations. He would be limited to occasionally crawling. He should never climb a ladder, rope or scaffold. He should avoid concentrated exposure to vibrations and hazards including heights and machinery. First question is with those limitations could he perform any of his past work?

(Tr. at 352.)

The vocational expert responded: "Yes, sir. The cleaner job in 2004, 2004 is applicable. The pantry goods maker is consistent with that. The waiter is consistent with that, those limitations. The nursing assistant would not be." (Tr. at 353.)

In his decision, the ALJ considered the hypothetical questions and concluded:

> The claimant's representative asked the vocational expert to consider an individual with the above residual functional capacity as stated in Finding No. 5 and to further consider the individual must lie down two times a day for one hour, in response to which the vocational expert testified there would be no jobs for such an individual. The claimant's representative then asked the vocational expert to consider the individual is limited to lifting and carrying 15 pounds occasionally and 5 pounds frequently, in response to which the vocational expert testified the individual could perform sedentary

27

work activity.  The claimant's representative then asked
the vocational expert to consider the individual is
unable to get along with people, which has resulted in
the loss of 80 jobs, in response to which the vocational
expert testified there would be no jobs for such an
individual.  The undersigned rejects the hypothetical
questions asked by the claimant's representative as they
are not supported by the objective and credible evidence
of record.  Accordingly, in the opinion of the
undersigned, the limitations propounded in the above
residual functional capacity in Finding No. 5 contain all
inferences regarding the claimant's impairments and the
degree of severity thereof which was raised by the
objective and credible evidence of record.  Accordingly,
the claimant can return to his past relevant work.

(Tr. at 26-27.)

Contrary to Claimant's assertions, the ALJ fully considered
the totality of Claimant's impairments and their combined effect on
his ability to sustain work activity before posing his hypothetical
question.  Further, the ALJ fully considered the Claimant's
hypothetical questions and did not err in finding they were not
supported by the substantial evidence.

The court proposes that the presiding District Judge find that
the hypothetical question posed by the ALJ included those
limitations that were supported by substantial evidence of record.
Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (While
questions posed to the vocational expert must fairly set out all of
Claimant's impairments, the questions need only reflect those
impairments that are supported by the record.).  The ALJ's residual
functional capacity finding related to Claimant's impairments
reflected Claimant's limitations, including pain and the effect

28

that his pain and his other symptoms would have on his ability to work, as supported by substantial evidence of record.   These limitations were included in a hypothetical question, and the vocational expert identified a significant number of jobs that Claimant could perform.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable John T. Copenhaver.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder

v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

    February 23, 2009    
       Date

                              Mary E. Stanley
                              Mary E. Stanley
                              United States Magistrate Judge